UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
ACHMAT AKKAD,

                       Plaintiff,

  -against-

THE CITY OF NEW YORK, and FORMER COMMISSIONER LOREE SUTTON, in her individual capacity,

                       Defendants.
------------------------------------------------------------------- X

**COMPLAINT**

**JURY TRIAL DEMANDED**

20 CIV. 4152

      Plaintiff Achmat Akkad, by his attorney, the Law Office of Deborah H. Karpatkin, complaining of defendants The City of New York (the "City") and former commissioner Loree Sutton ("Sutton") in her individual capacity (collectively, "defendants"), alleges as follows:

## NATURE OF THE ACTION

      1.    Achmat Akkad is an honorably discharged Air Force veteran. He was employed as a Community Coordinator at the Department of Veteran's Services, an agency of defendant City, from November 2015 until his unlawful termination in June 2017. Defendants fired Akkad, despite a record of strong performance, because of his record of military service-connected disability, his religion, and his constitutionally protected political speech in support of human rights and social justice causes. Defendants violated Akkad's federal rights under the First Amendment, as enforced through 42 U.S.C. §1983 ("Section 1983"), and under the Uniformed Services Employment and Reemployment Act ("USERRA"). Defendants discriminated against Akkad on the basis of his disability and religion, in violation of the New York City Human Rights Law, Administrative Code of the City of New York §8-107 et seq. (the "NYCHRL"), and violated his rights under the New York State Constitution.

1

2. Akkad seeks injunctive and declaratory relief, compensatory and punitive damages, and other appropriate legal and equitable relief.

## PARTIES, JURISDICTION AND VENUE

3. Plaintiff Achmat Akkad is a resident of the State of New York. He is African American and Muslim. He served in the Air Force from November 2003 until January 2005, when he was honorably discharged. He was employed by the New York City Department of Veterans Services ("DVS") from November 2015 – June 2017.

4. Defendant City of New York is a municipality. The New York City Department of Veterans Services (DVS) (formerly the Mayor's Office of Veteran's Affairs) is an agency of the City of New York. Defendant City of New York is an employer within the meaning of USERRA and the NYCHRL.

5. Defendant Loree Sutton was at times relevant to this action the Commissioner of the Department of Veterans Services. Sutton was an appointee of the Mayor. At all relevant times, Sutton's actions were undertaken under color of state law. Sutton is an "employer" within the meaning of USERRA and the NYCHRL. Sutton had control of Akkad's employment opportunities.

6. Defendant Sutton is a retired Brigadier General, and the founding Commissioner for DVS. She is a career Army psychiatrist. She resigned from DVS in October 2019.

7. This court has subject matter jurisdiction of Akkad's federal claims pursuant to 28 U.S.C. §§1331 and 1343 (federal question), and 38 U.S.C. §4343(b). This court has supplemental jurisdiction over Plaintiff's claims under the NYCHRL and the New York State Constitution pursuant to 28 U.S.C. §1367(a), because they form part of the same case or controversy.

8. Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district. Venue is also proper pursuant to 38 U.S.C. §4323 because DVS maintains a place of business within this district.

9. Pursuant to §8-502(c) of the NYCHRL, Plaintiff will serve a copy of this Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

## JURY DEMAND

10. Plaintiff demands a trial by jury.

## STATEMENT OF FACTS

11. Akkad was born and raised in Jacksonville, Florida. He was raised in poverty by a single mother and his grandmother, with the support of neighbors and teachers who believed him.

12. Akkad graduated from high school in Jacksonville in 2003 and enlisted in the Air Force.

13. Akkad is a Black male with a Muslim name. He is LGBTQ and observes the Muslim faith.

**Akkad's Military Service**

14. Akkad served in the Air Force from November 2003 until his Honorable Discharge in January 2005. He achieved the rank of Airman First Class, and received an Air Force Training Ribbon, the National Defense Service Medal, and the Air Force Good Conduct Medal.

15. During his military service, Akkad was the victim of abusive bullying and violent sexual assault, based on his race and his sexual orientation. The Air Force ignored his complaints, and Akkad was subject to additional bullying and harassment.

16.     In 2005, "Don't Ask Don't Tell" was still in effect. Knowing his LGBT status, and the symptoms of emotional distress he was experiencing due to the trauma he suffered, the Air Force issued Akkad an Honorable Discharge, because of a claimed "personality disorder."

17.     The abuse suffered by Akkad in the Air Force caused Akkad severe emotional distress, and Akkad was subsequently diagnosed with service-connected PTSD, for which he is receiving treatment, on an ongoing basis.

**Akkad's Education**

18.     Akkad earned an Associate's Degree from the Fashion Institute of Technology (FIT) in Advertising and Marketing Communications. He earned a Bachelor of Applied Science degree from FIT in International Business, Trade, and Tax Law (awarded in 2014).

**Akkad's Commitment to Social Justice and Social Media**

19.     Akkad has a lifelong commitment to social justice. In addition to his work at DVS, Akkad has used his communications and social media skills in support of Kurdish refugees, and persons with HIV/AIDs.

20.     At all times relevant to this Action, Akkad has engaged in social justice work on issues of racial justice, environmental justice, LGBT justice, and other civil rights and human rights causes.

21.     Akkad's personal social media, which he engages in as a private citizen and not pursuant to his official duties, addresses subjects such as LGBT rights, environmental justice, the Black Lives Matter movement, gentrification, affordable housing, indigenous human rights, police misconduct, Islamophobia, white supremacy, and other civil rights and human rights issues.

**Akkad's Employment at DVS**

22. According to the DVS website, "recognizing the need to better serve New York City's more than 210,000 service members, veterans, and their families," New York City Department of Veterans' Services (DVS) – formerly the Mayor's Office of Veteran's Affairs (MOVA) – was officially established in 2016 by Local Law 113. New York City is the first major city in the US to establish its own agency devoted solely to service members, veterans, and their families.

23. As a student at FIT, where he may have been one of the first student Veterans, Akkad noticed the absence of an office for Veteran students, and successfully lobbied FIT to designate someone to assist Veterans with financial aid and similar matters.

24. Akkad's advocacy on behalf of Veterans at FIT led him to apply for a job at MOVA. He was hired by MOVA with the civil service title of Community Coordinator, and the functional title of Outreach Coordinator, in November 2015.

25. Akkad performed his duties at MOVA, and then at DVS, at a very high level, and his performance was well regarded.

26. Throughout the course of his employment at MOVA and DVS, Akkad received positive feedback about the quality of his work. At no time did Sutton or anyone else from MOVA or DVS ever tell Akkad that his work performance needed improvement or that he might be removed from his position due to his work performance, or for any other reason.

**Akkad Receives New York State Department of Veterans Affairs Certification**

27. As part of his responsibilities, Akkad sought certification by the New York State Division of Veterans' Services (NYS DVS). Said certification would allow Akkad to submit VA claims on behalf of New York Veterans.

28. That certification included a background check.

29. In connection with the background check, Akkad learned from one of his supervisors, Latisha Russaw, that an issue had been raised about his "Black Lives Matter" activism. In his personal, off-duty time, Akkad was attending Black Lives Matter demonstrations and community events, and engaging in personal social media on Black Lives Matter issues and concerns.

30. Russaw advised Akkad to "lay low." Akkad did not change his personal, off-duty social activism on behalf of Black Lives Matter, or any other social justice movement.

31. Akkad was thereafter granted the NYS DVS certification.

**NYC Acknowledges and Celebrates Akkad's work at DVS**

32. In 2017, the Mayor's Office showcased Akkad, among others, in a photo-essay called "Speaking Out: Diverse Black Male Voices of City Hall.[1]"

33. Akkad was invited by City Hall to participate in an initiative called "Black Men in Government," initiated by NYC Deputy Mayor Richard Buery. Akkad was invited to participate in this initiative by Quintin Hayes, then Chief of Staff for Deputy Mayor Buery.

34. As a participant in that initiative, Akkad participated in brown bag lunches, which addressed topics which included working as a African-American man in NYC Government, especially in the time of Black Lives Matter. The Mayor's Office praised Akkad for his participation in this initiative.

35. Akkad was DVS's LGBTQ liaison. Akkad worked on an initiative to get LGBTQ Veterans discharge upgrades. Representing DVS, he attended LGBTQ-related events at City Hall,

---

[1] https://medium.com/@nycgov/speaking-out-diverse-black-male-voices-of-city-hall-69af2ed70342 (visited 5/18/2020)

Pride events, and other community events. The Veterans advocacy community praised Akkad for his work on behalf of LGBTQ Veterans.

36. As part of his responsibilities with DVS, Akkad worked with Bronx Borough President Ruben Diaz's staff on Veterans issues. Akkad was praised by DVS and by the Veterans advocacy community for these efforts.

**Defendant Sutton's Discriminatory Bias Against Akkad's Religion, Military Service-Connected Mental Health Disability, and Personal, Off-Duty Political Speech**

37. In 2016, Akkad was supervised by Assistant Commissioner Jamal Othman.

38. In or about May 2016, Akkad disclosed to Othman that he suffered from PTSD because of his prior military service.

39. Akkad disclosed his PTSD condition to Sutton. On information and belief, Othman also informed Sutton of Akkad's military service-connected mental health disability.

40. In or about July 2016, Sutton expressed to Othman that she believed Akkad was a "danger" because of his military service-connected mental health disability and his Muslim faith.

41. Sutton expressed to Othman that Akkad was a "danger" to her and a potential "terrorist" because of his military service-connected mental health disability and Muslim religious faith.

42. Sutton expressed to Othman, regarding Akkad: (1) "He's growing his beard out," "we don't know what he's capable of," and (3) he looks "like an ISIS member."

43. Akkad's moderate beard, a reflection of his deepening spiritual connection to his Muslim faith, did not make him look "like an ISIS member." Akkad rejects ISIS as non-Islamic.

44. Sutton directed Othman to run internet searches on Akkad to check his background and social media posts, to find potentially derogatory information and determine his "political views."

45.     Sutton told Othman that she wanted to find a reason to terminate Akkad because of his mental health disability and political and/or religious views.

46.     Sutton directed Othman to draft a report in her name to provide to Quintin Hayes ("Hayes"), then Director of Human Resources for the Mayor's Office.

**The Sutton Report**

47.     Sutton submitted the report Othman drafted for her, dated August 3, 2016, under her name ("the Sutton Report").

48.     The Sutton Report claimed that in March 2016, in a process seeking to have DVS Community Outreach Specialists receive VA accreditation, some "red flags were raised" about Akkad's good character and reputation.

49.     The Sutton Report purported to rely on information "disclosed to DVS verbally" that: (a) Akkad "made potentially provocative remarks on social media and blogs," (b) Akkad's DD-214 (his military discharge document) purportedly indicated that he served less than two years and did not complete his enlistment; (c) Akkad's "Reasons for Separation" was "Personality Disorder"; and (d) Akkad was not available to sign his DD-214.

50.     The Sutton Report did not identify the source of these verbal disclosures.

51.     These claimed "verbal disclosures" were false or misleading, for several reasons, and provide no basis for legitimate personnel action, including, but not limited to, the following: (a) Akkad's purported "provocative remarks" as a private citizen on matters of public concern were protected First Amendment activity; (b) Akkad's military service was shorter than two years due to his being LGBTQ, the victim of sexual assault, bullying, and retaliation, and experiencing traumatic stress therefrom; (c) Akkad's "reasons for separation" on the DD-214 related to his

8

LGBTQ status and the emotional distress he suffered; and (d) Akkad's DD-214 was in fact signed by Akkad.

52. The Sutton Report's references to Akkad's military service and reasons for separation evidence bias against Akkad due to his military service and mental health.

53. When the Department of Defense policy of "Don't Ask Don't Tell," with regard to LGBTQ service members was in effect, which included the period of Akkad's military service, and before PTSD was properly recognized by the military, "personality disorder" was typically used as the "reason for separation" for LGBTQ service members, and service members experiencing PTSD.

54. The Sutton Report did not disclose the substance of the "potentially provocative remarks on social media and blogs."

55. The Sutton Report described as "Next Steps/Approach" the following:

> … Achmat should be counseled that that issues raised can be interpreted negatively by the community and can reflect poorly on the agency.
>
> Achmat should be further counseled that as of the transfer he agrees to delete all social media posts of a provocative nature and refrain from writing such posts while an employee of the City. If Achmat agrees and acknowledges adhering to a conduct that will reflect the best interest the agency, the administration, and the population we are serving, he will be internally transferred to an existing office title that is available. His civil service title will not change, and therefore, the degree of his responsibilities will remain the same as well as any planned salary adjustments as a result of the functional transfer.

**The Sutton Report Meeting**

56. After the submission of the Sutton Report to Hayes, Sutton and Hayes met in September 2016 to discuss it (the "Sutton Report Meeting"). Othman was present at the Sutton Report Meeting.

57. During the Sutton Report Meeting, Sutton advocated to Hayes that adverse action should be taken against Akkad because of the political nature of his social media comments.

58. Sutton had previously repeatedly stated to Othman that the real reason she wanted to remove Akkad from DVS was because of his mental health disability and his Muslim religion.

59. During the Sutton Report Meeting, Hayes admonished Sutton for the actions she had taken against Akkad, and stated that Sutton may have violated Akkad's rights.

60. During the Sutton Report Meeting, Hayes instructed Sutton that: (a) Akkad had already passed a background check for his employment; (b) It was inappropriate to continue to dig further into Akkad's background; (c) Sutton may have violated Akkad's rights to political speech by pursuing an adverse action based on Akkad's political views; and (d) Sutton should base any subsequent adverse action purely on work performance.

61. On information and belief, several months after being admonished by Hayes for targeting Akkad, Sutton directed Jason Parker, then Director of Administration, to make a report to the NYC Police Department regarding Akkad's purported suspicious activities – his political social media posts.

62. In or about February or March 2017, after the Sutton Report Meeting, Akkad was promoted to a role with additional social media responsibilities, reporting to DVS Press Secretary Alexis Wichowski ("Wichowski"). His functional title was changed to "Communications and Special Projects Coordinator." Akkad received a salary increase because of his increased responsibilities.

63. Before this promotion, Akkad had been responsible for DVS social media for several months, in addition to his other responsibilities, and had received positive recognition for his efforts from the Mayor's Office and other important constituencies.

64. In or about May 2017, Wichowski evaluated Akkad's performance, and gave him high ratings on all performance criteria.

65. Akkad did not receive any coaching from Wichowski regarding any deficiencies in his performance.

66. Akkad did not receive a Performance Improvement Plan ("PIP") from Wichowski and no PIP was ever issued to him.

**Akkad Experiences Mental Health Issues and Seeks Leave**

67. During the course of his employment, Akkad from time to time needed to leave work for medical appointments for his mental health, but DVS was hostile to Akkad's requests, and questioned his health care provider's notes.

68. In the period April – May 2017, Akkad was experiencing some mental health issues, due to events in his personal life. Akkad continued to perform all of his job duties, at a very high level.

69. On the advice of his health care provider, Akkad wanted to take some time off to address some mental health issues.

70. Akkad informed his supervisors that he was planning to take some time off to address some mental health issues.

71. Akkad spoke to City's Employee Assistance Program and his Union, and thereafter Akkad enrolled in an insurance plan with the Union that would have covered his salary for time off.

72. Defendants were aware of Akkad's mental health issues.

73. Defendants were hostile to Akkad taking time off, making it difficult for him to take days off or leave early for medical appointments.

74. Akkad's supervisors told him that he needed to use sick time to visit EAP.

75. Following the military mantra of "mission before self," Akkad continued to work and perform all his duties to a high standard.

76. In particular, Akkad was focused on the many responsibilities he had during Fleet Week, scheduled from May 24-30, 2017.

77. Akkad planned to take the time off he needed for his mental health after Fleet Week.

78. In an email very early in the morning of May 31, 2017, Akkad wrote to Wichowski, letting her know that he has some "major issues" … (physical and mentally.)" and requested permission to come into work a bit later.

79. Wichowski replied that Akkad should "rest up and if you need to take the day off, please do. Let me know what you decide."

80. Akkad let Wichowski know that he would take off May 31, 2017, and June 1, 2017 due to his health.

81. Akkad also spoke to Latisha Russaw, DVS Director of Engagement and Events, and Ines Idhan, DVS Director of Human Services, to inform them of his absence on these days.

82. Akkad took May 31, 2017 and June 1, 2017 as sick days.

83. DVS refused to recognize Akkad's sick days as paid sick days, and instead recorded them as unpaid leave time.

84. DVS also failed to pay Akkad for his work during Fleet Week, notwithstanding that Akkad was still an employee of DVS in that period.

**DVS Fires Akkad**

85. On June 2, 2017, DVS fired Akkad. On his way into work, Akkad was met in the building lobby by Jason Parker, DVS HR, and armed security guards, and publicly fired. The armed security guards escorted him out of the building.

86. DVS also failed to pay Akkad for his last day of work, June 2, 2017.

87. Any claim that DVS fired Akkad due to poor performance, or for any other legitimate non-discriminatory and lawful reason, is false and pretextual.

88. Akkad was praised by his supervisor, his DVS colleagues, respected members of the NYC Veterans community, and others, including the Mayor's Office, for his excellence, his "positive and professional" representation of himself and DVS, and his improvement of DVS digital communications.

89. During his employment for DVS, Akkad received numerous emails from City Hall and DVS constituents praising his work.

**Sutton's Discriminatory Animus Against Other DVS Employees with Service-Connected Mental Health Issues**

90. In addition to Akkad, on information and belief, Sutton expressed animus against and took adverse employment action against other DVS employees with military service-connected mental health issues, including, but not limited to, Othman.

91. Like Akkad, defendants fired Othman, for no legitimate, non-discriminatory reason.

92. Like Akkad, Othman was given no notice of his termination, and was escorted out of the workplace by armed guards.

93. In addition to Akkad and Othman, on information and belief, Sutton expressed animus against another DVS veteran with a mental and/or psychological disability, who received a reasonable accommodation of their disability.

94. On information and belief, when a veteran with a mental and/or psychological disability left DVS, Sutton expressed her pleasure and learning of the employee's departure.

95. On information and belief, Sutton told Othman, "no more troubled veterans," indicating that Othman was not to hire veterans with mental health disabilities.

**Defendants' Discriminatory and Retaliatory Acts**

96. Akkad did not learn of Sutton's discriminatory statements and actions about his military service, religion and disability, or of her retaliatory statements and actions about his protected free speech, until shortly before the filing of this lawsuit.

97. Defendants terminated Akkad because he was a Muslim veteran with a mental health disability, and because he requested medical leave to address his mental health disability.

98. Defendants engaged in unlawful surveillance of Akkad's protected First Amendment speech activities, which was undertaken because Akkad is Muslim and/or because he has a mental health disability, and/or because he is a Veteran.

99. Defendants' actions with regard to Akkad's protected First Amendment speech activities were a pretext for defendants' unlawful discrimination against Akkad because of his disability and/or his religion and/or his Veteran status.

100. Defendants would not have terminated Akkad but for his protected First Amendment speech activities.

101. Defendants discriminated against Akkad because of his religion, and/or his disability, and or his status as a Veteran with a mental health disability, and/or because of his protected First Amendment free speech.

102. Akkad has suffered and has continued to suffer economic hardship and profound emotional distress because of defendants' unlawful and discriminatory acts.

**FIRST CAUSE OF ACTION**
**UNIFORMED SERVICES EMPLOYMENT AND REEMPLOYMENT RIGHTS ACT**
**(USERRA), 38 U.S.C. §4311**
**(Against All Defendants)**

103. Plaintiff realleges and incorporates by reference the allegations in the foregoing paragraphs as if fully set forth herein.

104. Defendants knew that Plaintiff was a veteran and a former uniformed service member.

105. Defendants unlawfully denied Plaintiff the benefits of employment in violation of §4311(a) of USERRA by using his service-connected mental health disability as a negative factor in evaluating Plaintiff's performance and in terminating him.

106. Defendants denied Plaintiff reasonable accommodation due to his military service-connected disability, in violation of §4311(a) of USERRA.

107. Plaintiff's military service, and his service-connected mental health disability, was a motivating factor in Defendants' discharge of Plaintiff.

108. Defendants' discharge of Plaintiff violated §4311(a) of USERRA.

109. Defendants acted willfully.

110. As a result of Defendants' violations of §4311(a), Plaintiff has suffered loss of employment, wages, and benefits.

## SECOND CAUSE OF ACTION
## FIRST AMENDMENT RETALIATION UNDER 42 U.S.C. §1983
**(Against All Defendants)**

111. Plaintiff realleges and incorporates by reference the allegations in the foregoing paragraphs as if fully set forth herein.

112. Plaintiff expressed views about matters of public significance in his personal social media, which he engages in as a private citizen, and not pursuant or connected with his official duties at DVS.

113. Defendants sought to terminate and did terminate Plaintiff, because of his protected First Amendment activities, in violation of Plaintiff's rights under the First Amendment to the United States Constitution and 42 U.S.C. §1983.

114. Defendants' claimed legitimate nondiscriminatory reasons for terminating Plaintiff are pretextual, and defendants' real reason for terminating Plaintiff is defendants' its unlawful views of Plaintiff's protected First Amendment speech.

115. Defendants engaged in these practices with malice and with reckless indifference to Plaintiff's federally protected rights.

116. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation because of Defendants' unlawful acts.

## THIRD CAUSE OF ACTION
## THE NEW YORK CITY HUMAN RIGHTS LAW ("NYCHRL")
**Disability and Religious Discrimination**
**N.Y.C. Admin. Code §8-107 *et seq.***
**(Against All Defendants)**

117. Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

118. Plaintiff is Muslim, and has a diagnosis of a military service-connected mental health disability, PTSD, which is a mental and/or psychological impairment within the meaning of the NYCHRL.

119. Defendants knew of Plaintiff's PTSD disability.

120. Plaintiff was at all relevant times Defendants' employee as that term is defined by the NYCHRL.

121. Defendants were at all relevant times Plaintiff's employers as that term is defined by the NYCHRL.

122. Defendants discriminated against Plaintiff by treating him less well because of, or in part because of his religion (Muslim) and/or his military service-connected PTSD disability, including by terminating him for no true, legitimate, non-pretextual reason.

123. As a supervisor, manager, and participant in the discrimination against Plaintiff, Defendant Sutton is individually liable to Plaintiff for her NYCHRL violations.

124. By the acts and practices described above, Defendants intentionally discriminated against Plaintiff because of his religion and/or his disability, in violation of the NYCHRL.

125. Defendants acted with malice and/or reckless indifference to Plaintiff's protected rights under the NYCHRL.

126. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation because of defendants' unlawful acts.

## FOURTH CAUSE OF ACTION
## NEW YORK STATE CONSTITION, Article 1, Section 8
### (Against All Defendants)

127.  Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

128.  By the acts and practices described above, including its adverse actions against Plaintiff as a result of his private, off-duty, protected speech and expression on matters of public concern, Defendants have violated Plaintiff's rights under Article 1, Section 8 of the New York State Constitution.

129.  Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation because of Defendants' unlawful acts.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff demands the following relief against the Defendants:

(a)  Declaring that the acts and practices complained of herein are, as specifically alleged, in violation of USERRA, 42 U.S.C. §1983, the NYCHRL and the New York State Constitution;

(b)  Enjoining and permanently restraining these violations of USERRA, §1983, the NYCHRL, and the New York State Constitution;

(c)  Directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

(d)  Directing Defendants to place Plaintiff in the position he would be in but for Defendants' discriminatory and retaliatory and unlawful treatment of him, and to make him whole for all earnings and benefits he would have received but for Defendants' discriminatory and

retaliatory and unlawful and treatment of him, including, but not limited to, wages and pension and other employee benefits;

 (e) Directing Defendants to reinstate Plaintiff, or, alternatively, to grant Plaintiff front pay;

 (f) Directing Defendants to pay an additional amount to compensate Plaintiff for the emotional distress Defendants' unlawful conduct has caused and is causing him;

 (g) Directing Defendant Sutton to pay punitive damages to Plaintiff for Sutton's violations of Plaintiff's rights under §1983 and the NYCHRL;

 (h) Directing Defendants to pay Plaintiff an amount equal to the amount of his lost wages and lost benefits as liquidated damages;

 (i) Awarding Plaintiff prejudgment interest under the CPLR in accordance with applicable New York State law and such other pre and post-judgment interest to which he may be entitled;

 (j) Awarding Plaintiff his reasonable attorneys' fees and costs; and

 (k) Awarding Plaintiff such other relief, legal or equitable, as may be warranted.

Dated: New York, New York
    May 31, 2020

Respectfully submitted

LAW OFFICES OF
DEBORAH H. KARPATKIN
99 Park Avenue, PH/ 26th Fl.
New York, New York 10016
(646) 865-9930

By: _/s/ Deborah H. Karpatkin_
  Deborah H. Karpatkin

*Attorney for Plaintiff Akhmat Akkad*